## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| **JACQUELINE WILKINS**, *individually, and on behalf of all others similarly situated*, | : : : : | CASE NO. 2:22-cv-02916-SDW-ESK |
|  | : | **FIRST AMENDED CLASS ACTION** |
|  | : | **COMPLAINT** |
| Plaintiff, | : : |  |
|  | : | **JURY TRIAL DEMANDED** |
| v. | : : |  |
| **NAVY FEDERAL CREDIT UNION**, | : : |  |
| Defendant. | : : |  |

Plaintiff Jacqueline Wilkins, individually and on behalf of all others similarly situated, hereby brings this Class Action Complaint against Defendant Navy Federal Credit Union ("Navy Federal" or "Defendant") and alleges as follows:

### INTRODUCTION

1.      The Zelle money transfer system is rife with fraud—fraud that places all Zelle users at an acute and immediate risk. Billions of dollars of fraudulent transactions are processed by the service each year. Victims of Zelle fraud, like Plaintiff, are often left devastated by such fraud, which can drain hundreds or thousands of dollars from their bank accounts.

2.      But Navy Federal was eager to encourage its accountholders to sign up for and use the new Zelle payment service, which allowed consumers to make Navy Federal debit card transactions via Zelle. Aware that consumers like Plaintiff would be hesitant to adopt a new payment methodology without assurances that the methodology could be trusted, Navy Federal and Zelle marketed Zelle as trustworthy ("backed by the banks" and "safe") and made express contract promises that accountholders using Zelle would have "Zero Fraud Liability" and all the same protections as exist for disputed debit card transactions.

1

3.    Navy Federal reneged on these promises.

4.    Having lured Navy Federal accountholders to sign up for and use the Zelle service with deceptive and incomplete marketing and contract promises, the Credit Union has failed victims of Zelle fraud. When such victims make a claim for Zelle fraud, Navy Federal denies the claim immediately without conducting a full investigation and without even offering access to the same provisional credit and dispute resolution process applicable to all other debit card transactions. As occurred with Plaintiff, Navy Federal summarily rejects fraud claims without explanation or recourse.

5.    These policies and practices contradict Navy Federal's marketing promises, contract promises, and duty of care owed.

6.    Plaintiff and the Class members have been injured by signing up for and using Zelle. Plaintiff brings this action on behalf of herself, and the putative Classes, because Plaintiff should not be left "holding the bag" for fraudulent transactions.

7.    Plaintiff seeks actual damages, punitive damages, restitution, and an injunction on behalf of the general public to prevent Navy Federal from continuing to engage in its illegal practices as described herein.

**PARTIES**

8.    Plaintiff Jacqueline Wilkins is and was domiciled at 1800 Carnegie Street, Linden, New Jersey 07036 and was a New Jersey citizen at all times relevant to this lawsuit.

9.    Defendant Navy Federal Credit Union is and was, at all relevant times to this lawsuit, a nationally-chartered credit union with its with its principal place of business in Vienna, Virginia. Navy Federal operates banking centers and conducts business throughout the State of New Jersey.

2

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. § 1332(d)(2), because the matter in controversy exceeds $5,000,000, exclusive of interest

and costs, and is a class action in which at least one member of the class is a citizen of a different

State than Navy Federal. The number of members of the proposed Classes in aggregate exceeds

100 users. 28 U.S.C. § 1332(d)(5)(B).

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because

Navy Federal is deemed to reside in any judicial district in which they are subject to personal

jurisdiction and  substantial part of the events or omissions giving rise to the claims occurred in

this District.

## FACTUAL ALLEGATIONS

**A.     Zelle – The Favorite App of Fraudsters and a Moneymaker for the Credit Union**

12.     Created in 2017 by America's largest banks[1] to enable digital money transfers,

Zelle comes embedded in banking apps and is now America's most widely used money transfer

service, outpacing its closest rival (Venmo) by $260 billion in transfers in 2021.[2]

13.     About 1.8 billion payments — totaling $490 billion — were sent by consumers and

businesses through the Zelle Network in 2021, according to the Early Warning Services (the entity

that owns and operates Zelle). Total dollars transferred were up 59% from 2020.

---

[1] Bank of America, Capital One, JPMorgan Chase, PNC, BB&T (now Truist), U.S. Bank and Wells Fargo.
[2] *Fraud is Flourishing on Zelle. The Banks Say It's Not Their Problem*, The New York Times (March 6, 2022) https://www.nytimes.com/2022/03/06/business/payments-fraud-zelle-banks.html (last visited September 6, 2022).

14.     Nearly 18 million people have been hit by "widespread fraud" on money transfer apps, according to a letter sent in late April to Zelle's network operator Early Warning Services by U.S. Sens. Elizabeth Warren of Massachusetts, Robert Menendez of New Jersey, and Jack Reed of Rhode Island.

15.     "Zelle's biggest draw — the immediacy of its transfers — also makes scams more effective and 'a favorite of fraudsters,' as consumers have no option to cancel a transaction even moments after authorizing it," the letter stated.

16.     The 1,700 banks and credit unions who are members of the Zelle network, including Navy Federal, know full well that they have a widespread fraud problem on their hands, but have misrepresented and failed to take steps to warn their accountholders of these risks—or protect their accountholders who fall prey to fraud.

17.     The rampant fraud on Zelle is only escalating, according to an October 2022 senate report. Data provided by several banks revealed the rapidly increasing extent of fraud on the platform. The four banks that reported the relevant data received scam and fraud claims in excess of $90 million in 2020, and are on pace to receive scam and fraud claims in excess of $255 million in 2022.[3]

18.     In short, and unbeknownst to average Zelle users, but fully known to Navy Federal, the Zelle network has become a preferred tool for fraudsters like romance scammers, cryptocurrency con artists and those who use social media sites to advertise fake concert tickets and purebred puppies—or simply for those who steal phones and computers and use their access to drain money from accounts via Zelle.

---

[3] "Facilitating Fraud: How Consumers Defrauded on Zelle are Left High and Dry by the Banks that Created It," Office of Sen. Elizabeth Warren

19.     Fraudsters and scammers have turned to Zelle as their favorite service. The service seems designed precisely to meet their fraudulent needs, since transfers are immediate and unrecoverable. There is an additional design feature of Zelle that makes it a fraudster's favorite: one can become a Zelle user and recipient *without revealing their true identity*.

20.     Led by Idaho Attorney General Lawrence Wasden and Oregon Attorney General Ellen Rosenblum, a bipartisan coalition of thirty-three (33) attorneys general wrote the Consumer Financial Consumer Protection Bureau ("CFPB"), calling for stronger consumer safeguards for money sharing platforms and apps like Zelle. The letter, written in response to the CFPB's request for comments on its inquiry into "Big Tech Payment Platforms," noted a rise in complaints against popular payment apps including Zelle. The letter highlighted that: "[m]any consumers have been scammed out of hundreds or thousands of dollars by other users of these payment platforms [like Zelle]. ***Scammers are attracted to real-time payment platforms, in large part, because they do not need to reveal their true identity to set up an account***" (emphasis added).

21.     As a result, crooks are using Zelle and other apps to rob consumers when listing fake puppies to sell, advertising phony apartments or homes to rent, threatening utility service cut-off without immediate transfer of money, or offering extra income from wrapping a personal car in an ad.

22.     A common version of the utility scam (which Plaintiff fell victim to) involves fraudsters, posing as utility company employees, initially contacting customers via text message, then by phone call and asking them to make missed payments via Zelle.

23.     Another common scam: a prospective buyer supposedly wants to buy an item listed on Facebook Marketplace but then claims that the seller needs  to upgrade his Zelle app to accept money from their "business account" for the big-ticket purchase to go through, according to a June,

2022 alert by the Better Business Bureau.  The scammer supposedly puts up $300 and sends you screenshots of his Zelle app as proof. Then, the scammer pressures you into paying him back.

24.    Zelle is plagued with fraud, including repeat, well-known, and common scams, such as the ones mentioned above, that Navy Federal was aware of but never warned its customers about.

25.    "Scammers go where it's easy to get the money. Zelle is their current mechanism to drain consumer accounts," warned Ed Mierzwinski, PIRG Education Fund's senior director of federal consumer programs. "The scammers are taking advantage of consumers because the banks are letting them," Mierzwinski said. "My basic advice is don't use these apps."[4]

26.    The unique, misrepresented, and undisclosed architecture of the Zelle payment system and Navy Federal's own fraud policies means—again, unlike other payment options commonly used by American consumers—that virtually any money transferred for any reason via Zelle is gone forever, without recourse, reimbursement or protection for victimized accountholders.

27.    Banks and credit unions have a huge financial incentive to offer customers Zelle as part of their wider suite of banking services. Indeed, Early Warning Services (which operates Zelle) pitches Zelle to financial institutions with data claiming that "customers using Zelle are more profitable and stay with the financial institution longer."[5]

---

[4] *DTE impersonators drained Rochester Hills woman's checking account using Zelle app*, Detroit Free Press (June 30, 2022), https://www.freep.com/story/money/personal-finance/susan-tompor/2022/06/30/utility-shutoff-scam-stole-cash-via-zelle/7714138001/ (last accessed September 7,  2022).
[5] *Zelle® Closes 2020 with Record $307 Billion Sent on 1.2 Billion Transactions*, (March 19, 2021) https://www.zellepay.com/press-releases/zeller-closes-2020-record-307-billion-sent-12-billion-transactions (last accessed February 6, 2022).

28.      Zelle saves money for banks and credit unions as they spend less in other transaction costs, for example, on stocking ATMs with cash, as the head of Enterprise Payments at a national bank noted about Zelle.[6]

29.      Zelle also saves participating banks money by minimizing the fees the banks are charged for competitor digital payment apps and helps reduce other costly physical services like paper checks.

30.      Banks and credit unions also viewed Zelle as an entry point to drive members to their mobile app to maintain a central role in their financial lives.

31.      Ultimately, financial institutions offer Zelle to attract and retain customers, and when their customers use it, banks and credit unions like Navy Federal profit.

**B.      Navy Federal's False and Misleading Zelle Marketing and Deceptive Sign-Up Process Exploited Accountholders' Trust and Lured Accountholders to Sign Up for and Use Zelle**

Mass Marketing

32.      Zelle was introduced to the American public with a massive advertising blitz starting in 2018. Navy Federal and partner financial institutions marketed Zelle as a safer alternative to other instant payment apps and other payment methods "because it's backed by the banks."

33.      Marketing for Zelle is jointly designed and promulgated by Zelle and member banks. The advertisements exploit accountholders' existing trust in their financial institutions and focus on reinforcing that it's a trusted bank-backed app: "We do our own campaigns and we also work closely with banks and credit unions to give them materials and messaging to reach their

---

[6] *What's Zelle? Banks hope commercials get customers to notice the app*, Reuters, (January 29, 2018)        https://www.reuters.com/article/us-usa-banks-payments-zelle/whats-zelle-banks-hope-commercials-get-customers-to-notice-the-app-idUSKBN1FI0GB (last visited February 6, 2023).

customers." Stated Melissa Lowry, Vice-President of Marketing and Branding at Early Warning Services,  "*People can hear about Zelle from their banks and credit unions that they already know and trust.*"[7]

34.     Navy Federal and Zelle leveraged consumer trust of their existing financial institution to attract users: "Trust is at the heart of the consumer payment relationship," said Ravi Loganathan, Head of Business Intelligence at Early Warning Services. "Our research showed that new segments of consumers engaged in a P2P payment for the first time because it was offered from their known and trusted mobile banking environment [.]"[8]

35.     Whether the consumer wants it or not, Zelle comes integrated into Navy Federal's app and online banking website, unlike other peer-to-peer payment apps which require downloading a third-party app.

36.     Moreover, Navy Federal's embedding of Zelle into its app and website deceives consumers into perceiving Zelle as an extension of their traditional banking services: "In our research, we learned that people who are peer-to-peer skeptics are those resistant to using something outside traditional banking," said Rose Corvo, Chief Administrative Officer for Early Warning. "The fact that they have it in their banking app — that gets through the safety barriers in mind."

---

[7] *Zelle's Melissa Lowry: 'Beyond awareness, we're trying to show how we make everday better,'* Tear Sheet (March 21, 2019), https://tearsheet.co/podcasts/zelles-melissa-lowry-beyond-awareness-were-trying-to-show-how-we-make-everyday-better/

[8] *Zelle® Study Finds Growing Use of Digital Payments Across Generations* (July 11, 2018), https://www.zellepay.com/press-releases/zelle-study-finds-growing-use-of-digital-payments-across-generations

37.     In other words, Zelle and Navy Federal marketed Zelle with a fundamental pitch: we are your trusted financial institution, and we would not offer you a product that was not as "safe" as other products offered by Navy Federal.

38.     Aggressive marketing touted Zelle's bank-backed safety and security. In one TV commercial that aired in January 2018, performer Daveed Diggs from the Broadway show Hamilton rapped, "You can send money safely cause that's what it's for / It's backed by the banks so you know it's secure."

39.     Plaintiff recalls viewing this advertisement and understood the promise of "safety" and "backed by the banks" to refer to fraud and dispute resolution protection as existed with other Navy Federal payment methods like debit cards and credit cards.

40.     The general public and its leaders also reasonably understood the Zelle "safety" promises to refer to fraud protection. As Senator Elizabeth Warren said to CEOs of some of the banks that own Zelle, during a Senate Banking Committee hearing in September 2022: "Zelle is not safe. You built the system, you profit from every transaction on the system and you tell people that it is safe. But when someone is defrauded, you claim that's the customer's problem."

<u>Marketing During the Use of the Navy Federal App and Website and During Zelle Sign-up</u>

41.     Accountholders sign up for Zelle after they have already become Navy Federal accountholders—often, years later.

42.     Navy Federal's mobile app and online banking website feature numerous invitations and advertisements to sign up for and use the Zelle service.

43.     In its marketing about Zelle and during the Zelle signup process within the Credit Union's mobile app and website, the Credit Union's electronic interfaces make repeated promises that Zelle is a "fast, **safe** and easy way to send and receive money" (emphasis added).

9

44.     Plaintiff recalls viewing both these statements prior to signing up for and using Zelle and understood them to refer to fraud and dispute resolution protection as existed with other Navy Federal payment methods like debit cards and credit cards.

45.     At no time in its marketing or during the sign-up process does Navy Federal warn potential users of the true security risks of using the Zelle service—including the immediate and acute risk of fraud, the dangerous architecture of the system (described above), the risk that fraudulent losses will never be reimbursed by Navy Federal, and the risk that Zelle debit card transactions are much less safe than other payment methods offered by Navy Federal.

46.     Navy Federal misrepresents (and omits facts about) the true nature, benefits, and risks of the Zelle service, functioning of which means that users are at extreme and undisclosed risk of fraud when using Zelle. *Had Plaintiff been adequately informed of these risks, she would not have signed up for or used Zelle.*

47.     Navy Federal's marketing representations about Zelle—including within its app and website—misrepresent and never disclose these risks and material facts, instead luring accountholders to sign up for and use the service with promises of ease, safety and security.

48.     These representations—which all users view, including Plaintiff, during the sign-up process—are false and contain material omissions.

49.     Navy Federal misrepresents the true nature, benefits and risks of the service, which burden users with an extreme and undisclosed risk of Zelle causing losses due to fraud. Plaintiff would not have used Zelle if she had been adequately informed of the risks.

50.     Navy Federal's misrepresentations and omissions are especially pernicious because Navy Federal alone knows material facts regarding Zelle—including rampant fraud, the fact that fraud-induced Zelle transfers will never be reimbursed to accountholders, and the fact that Zelle

debit card transactions are verifiably less protected and less safe than other payment methods offered by the credit union. Navy Federal intentionally concealed those dangers and risks from Plaintiff and Class members to induce them into signing-up for and using Zelle.

51.     The general public and its leaders reasonably understood the "backed by the banks" and "safety" promises to refer to fraud protection. As Senator Elizabeth Warren said to CEOs of some of the banks that own Zelle, during a Senate Banking Committee hearing in September 2022: "Zelle is not safe. You built the system, you profit from every transaction on the system and you tell people that it is safe. But when someone is defrauded, you claim that's the customer's problem."

C.     **Navy Federal Breaches Contract Promises That Debit Card-Linked Zelle Transactions Come with Zero Fraud Liability and the Same Protections as Other Debit Card Transactions, Including a Robust Dispute Resolution Process**

52.     In addition to marketing promises, Navy Federal makes strong contract promises that Zelle transactions processed as debit card transactions will come with robust fraud and dispute resolution protections.

53.     For all accountholders like Plaintiff with an active debit card, Navy Federal processes Zelle transactions as a debit card transaction.

54.     Navy Federal expressly promises accountholders as much in the Zelle Agreement, attached hereto as **Exhibit 1**:

> This Agreement includes, and your use of the Zelle and Other Payment Services is subject to, the terms of the Important Disclosures (NFCU 606); Mobile Banking, Online Banking, and Bill Pay Terms and Conditions (NFCU 652A); and Debit Card Disclosure (NFCU 210AB) that apply to your use of the Zelle and Other Payment Services and the portion of the Site through which the Zelle and Other Payment Services are offered.

> By providing us with names, mobile phone numbers, and/or email addresses of recipients to whom you wish to send a payment, you authorize us to initiate a payment through the Zelle Payment Service. When we initiate a payment on your behalf, you authorize us to debit your Eligible Transaction Account for the amount of any such payment and to send funds to the Eligible Person's financial institution. If you have an activated Navy Federal Debit Card, your payment will be processed as a debit card transaction. If you do not have an activated Navy Federal Debit Card, your payment will be sent as an ACH transaction.

Zelle Agreement at 8.

55.     Navy Federal therefore reasonably promised that Zelle transactions processed as debit card transactions would receive the same fraud and dispute resolution protections as all other debit card transactions. Indeed, neither the Zelle Agreement nor the Debit Card Agreement exclude Zelle transactions processed as debit card transactions from the normal protections afforded all debit card transactions.

56.     Debit card transactions at Navy Federal, as with all other banks and credit unions, come with extensive fraud and dispute resolution protections.

57.     The Debit Card Disclosure in effect at the time of Plaintiff's alleged Zelle transactions, attached as **Exhibit 2,** makes a simple, straightforward "Zero Liability" promise for debit card transactions: "Navy Federal's Zero Liability Policy for Fraud: [I]f you notify us of suspected fraud within 60 days of the statement date on which the fraudulent transactions first appear, ***we will not hold you responsible for confirmed fraudulent transactions.***" Debit Card Disclosure at para. 15 (emphasis added).

58.     Navy Federal, however, never provided "Zero Liability for Fraud" protections to Zelle debit card transactions, despite the fact that Plaintiff promptly notified Navy Federal that she had been defrauded and that she "suspected fraud."

12

59. Separately, the Debit Card Agreement in effect at the time of Plaintiff's alleged Zelle transactions also promises a robust resolution process for debit card transactions that the accountholder "disputes":

> Disputed transactions that are not covered by our Error Resolution Process such as defective, damaged, or non-receipt of merchandise or services, or items received "not as described" will be handled at our discretion. Please first make a good faith attempt to resolve discrepancies with the merchant. If your good faith attempt is not successful, we may use our dispute resolution process to act on your behalf and pursue recovery of funds from the merchant, based on your statement supporting your claim, as well as any documentation we may request. We may not be able to recover your funds. We will report the results of the dispute resolution process to you within 120 days; however, we are not obligated to issue a Provisional Credit during the dispute resolution process.

*Id*., at para. 17.

60. The Debit Card Agreement in effect prior to the 2022 update never stated that Zelle transactions were <u>not</u> eligible for Zero Fraud Liability protection, purchase protection or the dispute resolution process.

61. These provisions are and were reasonably understood by Plaintiff to mean that Zelle transfers effectuated via a Navy Federal debit card would be treated in the same manner as all other debit card transactions, with the same protections and same resolution process procedures.

62. In addition to its promises of Zero Fraud Liability for debit card purchases, Navy Federal also offers a robust dispute resolution and chargeback process for debit card purchases. But it fails to provide that dispute resolution and chargeback process for debit card-linked Zelle transactions.

63. Because Navy Federal's contract expressly states that Zelle transactions will be processed as debit card transactions (as described above), Navy Federal reasonably promised to treat disputed Zelle transactions made via debit card in the same manner as other debit card transactions.

64.     Plaintiff reasonably believed, therefore, that debit card-linked Zelle transactions would provide her with the same protections as Navy Federal provides for other debit card transactions. Those fraud and dispute protections for all other debit card transactions are robust.

65.     Navy Federal, like all banks and credit unions, offers a robust dispute resolution and "chargeback" process for debit card and credit card purchases. It works like this: a cardholder contacts their bank or credit union to dispute a transaction, claiming that it resulted from fraud or abuse. The bank or credit union then pulls the funds from the merchant's account, and returns them to the cardholder's account, or otherwise refunds the accountholder.

66.     In short, a debit card chargeback is a debit card charge that has been reversed by a bank or credit union. Chargebacks offer a critical layer of consumer protection, ensuring consumer confidence in payment card technology.

67.     Navy Federal routinely "charges back" debit card transactions disputed by accountholders, for any number of reasons, including shoddy or missing merchandise. With respect to debit card transactions, Navy Federal's policy and practice is to allow consumers to dispute debit card transactions for numerous reasons.

68.     In fact, Navy Federal goes to great lengths to recover their customers' money, or reimburse them for the loss even where recovery is impossible, for disputed debit card transactions.

69.     As part of this process, any Navy Federal member can dispute a debit card purchase. Once a member notifies Navy Federal of a problem with a debit card transaction, the credit union produces and provides the Form NFCU 628a for accountholders to lodge a dispute, attached hereto as **Exhibit 3**.

70.     As a reason for a debit card charge dispute, Form NFCU 628a allows accountholders to select from numerous options including, "Cancellation," "Returned Merchandise," "Non-Receipt of Goods or Services," and "Quality of Services or Goods."

71.     The dispute options, therefore, cover circumstances in which an accountholder makes a purchase, but did not receive what was bargained for.

72.     Upon information and belief, Navy Federal automatically issues provisional credits and affirms those provisional credits for virtually all debit card transactions disputed by accountholders. It does this routinely and as a matter of policy.

73.     There is, however, one major exception that exists as a result of a secret policy adopted by Navy Federal: the credit union refuses to issue provisional credits for Zelle debit card transactions.

74.     Without ever informing accountholders, Navy Federal also excludes Zelle debit card transactions from the debit card dispute resolution process altogether.

75.     Navy Federal never offered or provided a Form NFCU 628a for Plaintiff to fill out when she disputed her Zelle debit card transaction. In fact, as explained below, it never offered any dispute resolution process whatsoever, never asked for support or for documentation, never performed any investigation, and never made any attempt to recover her stolen money.

76.     Despite contractual promises to the contrary (including the implied covenant of good faith and fair dealing), Navy Federal completely failed to provide Zelle debit card transactions the same protections and dispute resolution as all other debit card transactions.

77.     Nor did Navy Federal ever warn that debit card-linked Zelle transactions would be excluded from debit card protections offered on all other purchases.

78.     Indeed, not until late 2021 did Navy Federal ever even attempt to state in the Debit Card Agreement what had been the truth all along: it had a corporate policy of excluding Zelle debit card purchases from the dispute resolution process all along.

79.     In late 2021—<u>after</u> the relevant Zelle transactions alleged by Plaintiff—Navy Federal added a single paragraph to its Debit Card Agreement stating:

> Transaction(s) conducted through a person-to-person payment service provider that transfers funds, such as the Zelle® network and Cash App, is intended for use among friends and family. There are no protections or warranties for the purchase of goods and services. Navy Federal is unable to pursue these merchants or the 3rd party recipient for recovery on your behalf through the dispute process.

80.     This late attempt to quietly add an exclusion for Zelle debit card purchases confirms that even Navy Federal believed prior versions of the Debit Card Agreement never contained such an exclusion.

81.     Moreover, Navy did not reasonably notify existing accountholders of this material change to the Debit Card Agreement in late 2021. It therefore did not become effective for any existing Navy Federal accountholder.

**D.     Plaintiff's Experience**

82.     When Plaintiff signed up for Zelle she was not informed that Zelle's service had a significant "catch" and that significant monetary losses could result from signing up for the service—or that those losses almost never are reimbursed by users' banks or credit unions.

83.     For example, on March 17, 2021, Plaintiff used her Navy Federal debit card to transfer $2,996.02 from Plaintiff's personal bank account using the Zelle service.

84.     Plaintiff received an automated voicemail purporting to be her utility company–PSE&G Electric. The automated voicemail informed Plaintiff her electric bill was overdue and requested immediate payment to prevent service disconnection. The automated voicemail provided

Plaintiff with a number to Zelle transfer her overdue balance. Because of the Covid-19 pandemic, New Jersey had a utility moratorium in effect and Plaintiff was indeed months behind on her electric bill. Fearful of her power and lights being shutoff, Plaintiff transferred $998.01 via Zelle to the number provided who she believed to be her electric company.

85.     To verify receipt of her payment, Plaintiff called the automated number back and was connected with different fraudsters acting under the guise of PSE&G Electric "agents" who stated that they did not receive her Zelle transfer and requested she transfer the money due again. The fraudsters reassured Plaintiff that any amounts paid over the balance would be refunded, thus Plaintiff complied and transferred another $998.01 via Zelle to the fraudsters.

86.     Again, the fraudsters, acting as PSE&G Electric "agents," repeatedly told Plaintiff that her payment was not received and suggested that she split the payment into two Zelle transfers and continued to reassure her that any overpayment received would be refunded. As requested, Plaintiff transferred $450.29 and $549.71 with her debit card via Zelle in hopes of avoiding the power shutoff.

87.     The next morning, Plaintiff, still distraught over the prior day's events, called the PSE&G Electric customer service number (not the fraudulent PSE&G number) to confirm receipt of her payment, but instead, she confirmed that she fell victim to fraud. The customer service representative informed her that PSE&G Electric does not accept payment via Zelle and warned Plaintiff of sophisticated scammers preying on their customers by threatening immediate shutoffs.

88.     Plaintiff immediately informed Navy Federal of the erroneous and fraudulent transfer, but Navy Federal refused to reimburse her for the losses, refused to treat her Zelle debit card transaction like every other disputed debit card transaction, and even refused to conduct a reasonable investigation or attempt to recoup her money.

89.     Specifically, Plaintiff requested to dispute the transaction and tried to file a fraud claim when she reported the Zelle scam, but Navy Federal's representative denied Plaintiff's request outright.

90.     Navy Federal never offered or provided a Form NFCU 628a for Plaintiff to report the disputed Zelle transaction.

## **CLASS ALLEGATIONS**

91.     Pursuant to Rule 23, Plaintiff brings this action individually and as representative of all those similarly situated, on behalf of the below-defined Classes:

> All persons who: a) had a bank account with Navy Federal and were induced via fraud to perform a Zelle debit card transfer; b) alerted Navy Federal of the fraudulent transfer within 60 days; and c) did not have the fraudulent transfer amount(s) credited by Navy Federal (the "Nationwide Class").

> All persons in New Jersey who: a) had a bank account with Navy Federal and were induced via fraud to perform a Zelle debit card transfer; b) alerted Navy Federal of the fraudulent transfer within 60 days; and c) did not have the fraudulent transfer amount(s) credited by Navy Federal (the "New Jersey Class").

92.     Excluded from the Classes are Defendant and its affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded are any judicial officers presiding over this matter and the members of their immediate families and judicial staffs.

93.     This case is appropriate for class treatment because Plaintiff can prove the elements of her claims on a class wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

94.     **Numerosity.** The members of the Classes are so numerous that joinder of all members would be unfeasible and impracticable. The precise membership of the Classes is unknown to Plaintiff at this time; however, it is estimated that the Classes are greater than one

hundred individuals. The identity of such membership is readily ascertainable via inspection of Defendant's books and records or other approved methods. Class members may be notified of the pendency of this action by mail, email, internet postings, and/or publication.

95.     **Common Questions of Law or Fact.** There are common questions of law and fact as to Plaintiff and all other similarly situated persons, which predominate over questions affecting only individual Class members, including, without limitation:

a)      Whether Plaintiff and the Class members lost money that was transferred from their account via Zelle;

b)      Whether Plaintiff and the Class Members were customers of Navy Federal at the time they lost money;

c)      Whether Defendant's representations and omissions about the Zelle service are false, misleading, deceptive, or likely to deceive;

d)      Whether Defendant failed to disclose the risks of using the Zelle service;

e)      Whether Navy Federal breached its contract;

f)      Whether Plaintiff and the Class members were damaged by Defendant's conduct;

g)      Whether Defendant's actions or inactions violated the consumer protection statute invoked herein; and

h)      Whether Plaintiff and the Classes are entitled injunctive relief.

96.     **Predominance of Common Questions:** Common questions of law and fact predominate over questions that affect only individual members of the Classes. The common questions of law set forth above are numerous and substantial and stem from Defendant's uniform practices applicable to each individual Class member. As such, these common questions

predominate over individual questions concerning each Class member's showing as to his or her eligibility for recovery or as to the amount of his or her damages.

97. **Typicality.** Plaintiff's claims are typical of the claims of the other members of the Classes because, among other things, Plaintiff and all Class members were similarly injured through Defendant's uniform misconduct as alleged above. As alleged herein, Plaintiff, like the members of the Classes, were deprived of monies that rightfully belonged to them. Further, there are no defenses available to Defendant that are unique to Plaintiff.

98. **Adequacy of Representation.** Plaintiff is an adequate class representative because they are fully prepared to take all necessary steps to represent fairly and adequately the interests of the members of the Classes, and because their interests do not conflict with the interests of the other Class members they seek to represent. Moreover, Plaintiff's attorneys are ready, willing, and able to fully and adequately represent Plaintiff and the members of the Classes. Plaintiff's attorneys are experienced in complex class action litigation, and they will prosecute this action vigorously.

99. **Superiority.** The nature of this action and the claims available to Plaintiff and members of the Classes make the class action format a particularly efficient and appropriate procedure to redress the violations alleged herein. If each Class member were required to file an individual lawsuit, Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Plaintiff with its vastly superior financial and legal resources. Moreover, the prosecution of separate actions by individual Class members, even if possible, would create a substantial risk of inconsistent or varying verdicts or adjudications with respect to the individual Class members against Defendant, and which would establish potentially incompatible standards of conduct for Defendant and/or legal determinations with respect to individual Class members which would, as a practical matter, be dispositive of the

interests of the other Class members not parties to adjudications or which would substantially impair or impede the ability of the Class members to protect their interests. Further, the claims of the individual members of the Classes are not sufficiently large to warrant vigorous individual prosecution considering all of the concomitant costs and expenses attending thereto.

### FIRST CAUSE OF ACTION
**Violation of New Jersey Consumer Fraud Act ("NJCFA")**
**N.J. Stat. Ann. § 56:8-1, *et seq*.**
**(Asserted on Behalf of the New Jersey Class)**

100.    Plaintiff repeats and realleges the above allegations as if fully set forth herein.

101.    Defendant, Plaintiff, and the Class members are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

102.    The New Jersey Consumer Fraud Act makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate … is declared to be an unlawful practice."  N.J. Stat. Ann. § 56:8-2.

103.    Defendant's practices, as described herein, constitute unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact, with respect to the advertisement of the Zelle service utilized by Plaintiff and New Jersey Class Members, in violation of the NJCFA, including by knowingly and intentionally making false or misleading representations that it provides "safe" and "secure" Zelle money transfer service through its website and mobile app. Further, Navy Federal's marketing regarding Zelle indicates the Credit Union will protect against fraudulent losses incurred using the Zelle service.

104.   Defendant, as described herein, violated the NJCFA, by knowingly and intentionally concealing and failing to disclose material facts regarding the true risks of utilizing the Zelle money transfer service through its website and mobile app.

105.   Defendant's practices, as described herein, constitute deceptive and/or fraudulent business practices in violation of the NJCFA because, among other things, they are likely to deceive reasonable consumers, who expect their bank to fully investigate and protect fraudulent losses incurred using the Zelle service as stated in marketing representations, contractual promises, and consistent with statutory obligations pursuant to EFTA. Moreover, Defendant's willful and intentional concealment and omission of the security risks of using the Zelle service, including the risk of fraud and the risk that fraudulent losses will never be reimbursed by Navy Federal as a matter of secret policy, is a practice that is likely to deceive a consumer acting reasonably under the circumstances, to the consumer's detriment.

106.   Defendant committed deceptive and fraudulent business acts and practices in violation of the NJCFA, by affirmatively and knowingly misrepresenting on its website and mobile app the true risks and operation of its service.

107.   Defendant's business practices have misled Plaintiff and the proposed New Jersey Class and will continue to mislead them in the future.

108.   Plaintiff relied on Defendant's misrepresentations.

109.   Plaintiff and the New Jersey Class members had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose. Plaintiff and the New Jersey Class members did not, and could not, unravel Defendant's deception on their own.

110.    Had Plaintiff known the true risks of using the Zelle service, she never would have signed up for and used the Zelle service.

111.    As a direct and proximate result of Defendant's deceptive and fraudulent business practices, Plaintiff and New Jersey Class members suffered and will continue to suffer ascertainable loss and actual damages. Defendant's fraudulent conduct is ongoing and present a continuing threat to New Jersey Class members that they will be deceived into making money transfers with the Zelle service.

112.    Plaintiff and New Jersey Class members seek order enjoining Defendant's unfair and deceptive acts or practices in violation of the NJCFA and awarding actual damages, costs, attorneys' fees, and any other just and proper relief available under the NJCFA.

**SECOND CAUSE OF ACTION**
**Breach of Contract Including Breach of the Covenant of Good Faith and Fair Dealing**
**(Asserted on Behalf of the Classes)**

113.    Plaintiff repeats and realleges the above allegations as if fully set forth herein.

114.    Plaintiff and members of the Classes contracted with Navy Federal for checking account services, as embodied in the Deposit Agreement & Disclosures.

115.    Navy Federal breached the terms of its contract with consumers when as described herein, Navy Federal failed to fairly investigate reported erroneous and fraudulent transactions on the Zelle money transfer service and failed to reimburse accountholders for fraud losses incurred on debit-card linked Zelle transactions.

116.    Further, under the law of each of the states where Navy Federal does business, an implied covenant of good faith and fair dealing governs every contract. The covenant of good faith and fair dealing constrains Defendant's discretion to abuse self-granted contractual powers.

117.   This good faith requirement extends to the manner in which a party employs discretion conferred by a contract.

118.   Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

119.   Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified. A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Other examples of violations of good faith and fair dealing are willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

120.   Defendant breached the covenant of good faith and fair dealing when it failed to fairly investigation reported erroneous and fraudulent transactions on the Zelle money transfer service and failed to reimburse accountholders for fraud losses incurred on debit-card linked Zelle transactions.

121.   Each of Defendant's actions was done in bad faith and was arbitrary and capricious.

122.   Plaintiff and members of the Classes have performed all of the obligations imposed on them under the contract.

123.   Plaintiff and members of the Classes have sustained monetary damages as a result of Navy Federal's breaches of the contract and covenant of good faith and fair dealing.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Classes, demands a jury trial on all claims so triable and judgment as follows:

      A.    Certifying the proposed Classes, appointing Plaintiff as representative of the Classes, and appointing counsel for Plaintiff as lead counsel for the respective Classes;

      B.    Declaring that Defendant's policies and practices as described herein constitute a breach of contract, and a breach of the covenant of good faith and fair dealing or unjust enrichment, violation of the New Jersey Consumer Fraud Act.

      C.    Enjoining Defendant from the wrongful conduct as described herein;

      D.    Awarding restitution of all fees at issue paid to Defendant by Plaintiff and the Classes as a result of the wrongs alleged herein in an amount to be determined at trial;

      E.    Compelling disgorgement of the ill-gotten gains derived by Defendant from its misconduct;

      F.    Awarding actual and/or compensatory damages in an amount according to proof;

      G.    Punitive and exemplary damages;

      H.    Awarding pre-judgment interest at the maximum rate permitted by applicable law;

      I.    Reimbursing all costs, expenses, and disbursements accrued by Plaintiff in connection with this action, including reasonable attorneys' fees, costs, and expenses, pursuant to applicable law and any other basis; and

      J.    Awarding such other relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff, individually and on behalf of all others similarly situated, hereby demand a jury

trial on all claims so triable.

Dated:  February 16, 2023

**DAPEER LAW, P.A.**
*/s/ Rachel Dapeer*
Rachel Dapeer, Esq.
New Jersey Bar No. 039272011
3331 Sunset Avenue
Ocean, New Jersey 07712
Telephone: 305-610-5223
rachel@dapeer.com

Andrew J. Shamis (admitted *Pro Hac Vice*)
Edwin E. Elliott (admitted *Pro Hac Vice*)
**SHAMIS & GENTILE, P.A.**
14 NE First Avenue, Suite 705
Miami, Florida 33132
Telephone: 305-479-2299
ashamis@shamisgentile.com
edwine@shamisgentile.com

Jeffrey D. Kaliel (admitted *Pro Hac Vice*)
jkaliel@kalielpllc.com
**KALIEL GOLD PLLC**
1100 15th Street., NW, 4th Floor
Washington, D.C.  20005
Tel: (202) 350-4783

Scott Edelsberg*
Christopher Gold*
**EDELSBERG LAW, PA**
20900 NE 30th Ave, Suite 417
Aventura, Florida 33180
Telephone: 305-975-3320
scott@edelsberglaw.com
chris@edelsberglaw.com

*Pro Hac Vice forthcoming*

*Counsel for Plaintiff and the Proposed
Class*